
FILED
DEC 30 2010

UNITED STATED DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MARIA HOUSER, individually, and<br>MARIA HOUSER, as the Special<br>Administrator of the Estate of ROBERT<br>HOUSER, deceased,<br><br>Plaintiff,<br><br>-vs-<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | * * * * * * * * * * * * * * | CIV. 08-4144<br><br>MEMORANDUM OPINION AND<br>VERDICTS RE: COURT TRIAL |

Maria Houser, individually, and as the Special Administrator of the Estate of Robert Houser, brought this action under the Federal Tort Claims Act. A Court Trial was held before this Court and the parties later briefed certain issues and provided the Court with other submissions. After considering the testimony, exhibits, and all documents on file, this Court issues its Memorandum Opinion and Verdicts.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Robert Houser was a veteran of the Korean Conflict and the Vietnam War. He served in the Air Force from March 3, 1953 to November 30, 1973. After returning from the Vietnam War, Mr. Houser's personality changed dramatically. In 1973, Mr. Houser retired from the military and was placed on 100% service related disability for depressive neurosis. Over the next twenty years, Mr. Houser's physical and mental health continued to deteriorate and he required his wife to assist him with bathing, dressing, and feeding. In April of 1997, Mr. Houser appointed his wife, Maria Houser, to have durable power of attorney for health care. Ex. 1, p. 3253. Mr. Houser's diagnoses included dementia, schizophrenia, organic brain syndrome, diabetes, and chronic obstructive pulmonary disease. On September 19, 2001, Mr. Houser was approved for nursing home care at the expense of the Department of Veterans Affairs (VA).

Mr. Houser was placed in a number of different nursing home facilities throughout the years

and stayed at the VA Medical Center intermittently throughout this time. On June 14, 2005, Mr. Houser fell and broke his hip while residing in the Beverly Nursing Home located in Redfield, South Dakota. Mr. Houser was taken to the VA Medical Center in Sioux Falls to repair the broken hip. After breaking his hip, Mr. Houser was immobile and lost a significant amount of weight. Mr. Houser was transferred from Southridge Nursing Home to the VA Medical Center in April of 2006. Mr. Houser was bedridden at that time. In July of 2006 Mr. Houser developed a blood clot in his leg. This condition required a Lovonox injection twice a day, and Mr. Houser had to be held down for these injections. Ex. A, p. 178. Mr. Houser had a history of being physically and verbally aggressive with the nursing staff while in the nursing home facilities.[1]

On August 30, 2006, the nursing staff observed a reddish purple bruising on Mr. Houser's left upper arm. Later in the day Mr. Howser advised Dr. Steven Brooks that he had fallen in the bathroom and bruised his arm. The United States presented evidence that Mr. Houser wore adult diapers, was bathed in his bed, and did not use the bathroom.[2] After the bruises were observed it appeared that it was painful for Mr. Houser to move his arm. An X-ray showed an impacted nondisplaced fracture of the left proximal humerus. On August 31, 2006, the certified nurse practitioner was called to Mr. Houser's room to observe an area in Mr. Houser's left lower leg just below the knee that showed a new swollen, firm, bruised area. An X-ray showed a nondisplaced fracture of the left proximal tibia and an associated fracture of the left proximal fibula.

Mr. Houser's attending physician, Dr. Thomas Burkhart, was not on duty at the VA at the time of the fall. In his note of September 5, 2006, Dr. Burkhart wrote of Mr. Houser, "He did NOT fall[;] this is documented by all the nurses." Ex. 1, p. 118. On December 17, 2007, at the VA's

---

[1]The Court notes that the October 2, 2000 discharge note from VA respite care states that Mr. Houser was a "very pleasant 67 yo male" and was "a pleasure to care for." Ex. 1, p. 3050. VA progress notes for May 15, 2003, establish that Mr. Houser was brought to the VA by his wife from a nursing home to evaluate a "rapid personality change . . . wherein he uncharacteristically began 'talking sex talk' and scaring people at Southridge Nursing Home." Ex. 1, p. 3024. As late as January 4, 2006, however, his physician at Southridge Nursing Home referred to Mr. Houser as a "delightful and pleasant gentleman." Ex. 1, p. 1536.

[2]The Court notes, however, that a progress note of June 20, 2006, discloses that when Mr. Houser refused to wash up in bed, the LPN caring for Mr. Houser asked him if he wanted to shower instead of bathing in bed. Ex. 1, p.216.

administrative investigation of allegations that a nursing staff member had dropped Mr. Houser,[3] Dr. Burkhart testified that initially the VA investigated the possibility of a fall "with a vengeance." However, when asked which staff were questioned, Dr. Burkhart could not recall. Ex. 1, p. 1953. No incident report of a fall was filed and the report of the investigation concluded that the allegations of a fall were not substantiated.[4] In August of 2006 Mr. Houser was regularly disoriented to place, date, person and time. The Extended Care and Rehab Service Line Site Director for the VA, Susan Honan, characterized Mr. Houser as being a hundred percent reliant upon the staff for all transfers.

Both Maria Houser, Mr. Houser's wife, and Ryan Higgason, Mr. Houser's son-in-law, testified in offers of proof that when they visited Mr. Houser after he suffered the fractures on the left side of his body, Mr. Houser greeted them and then said, "They dropped me." Mr. Houser never specifically identified who dropped him.

The Court eventually admitted Mr. Houser's statements to Maria Houser and Ryan Higgason under FED. R. EVID. 803(4). Rule 803(4) excludes from the hearsay rule: "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The statement need not be made to a physician to qualify as an exception to the hearsay rule under Rule 803(4). WEINSTEIN'S FEDERAL EVIDENCE § 803-06[4] (J. McLaughlin, 2d ed. 2010). Statements made to family members are admissible under FED. R. EVID. 803(4) if made for the purpose of diagnosis or treatment. *Id.*

---

[3]The stated purpose of the investigation was:
> [T]o investigate the facts and circumstances related to allegations that a nursing assistant attempted to lift a patient alone when two people are required to lift. The patient was allegedly dropped on the floor and suffered multiple fractures. The nursing assistant allegedly attempted to hide the injury but allegedly admitted fault some months later. This incident allegedly occurred on or about August 29th.

Ex. 1, p. 1907. This investigation was commenced after Plaintiff initiated her claim and lawsuit in this action.

[4]The Court references the VA's investigation as part of the factual background. The Court has ruled that the discretionary function exception to the Federal Tort Claims Act, *see* 28 U.S. § 2680(a), bars claims based on the inadequacy of the VA's investigation of the cause of Mr. Houser's injuries.

3

Maria Houser had been granted durable power of attorney for health care for Mr. Houser. Ex. 1, p. 1565. Maria Houser testified that Mr. Houser was not communicating very much with the staff at the time the bruising was discovered, and that he was communicating with Maria "as far as his pains and what happened to him." Maria Houser also testified that she "went straight to the nurses station and told them" what Mr. Houser had told her regarding being dropped. Mr. Houser's medical providers made a number of references to Maria's role in Mr. Houser's care. Ex. 1, pp.17, 18, 71. In addition, the record is replete with evidence of Mrs. Houser communicating with and being involved with the medical providers. Ex. 1, pp. 462, 936, 1084, 1255. Maria Houser was involved in feeding, medicating, and bathing Mr. Houser at the VA. There is substantial evidence that Maria Houser was Mr. Houser's medical advocate.

Admissibility under Rule 803(4) requires that a statement meet two criteria. The first criterion is that the declarant's motive in making the statement must be for "purposes of medical diagnosis or treatment." *United States v. Gabe*, 237 F.3d 954, 957-58 (8th Cir. 2001). The second criterion is that the content of the statement must be "pertinent" - the kind of statement reasonably relied upon by health care providers in treatment or diagnosis. *See Lovejoy v. United States*, 92 F.3d 628, 632 (8th Cir. 1996). Since Robert Houser communicated medical needs through his wife, the Court finds the first criterion is satisfied. So long as the identity of the person causing the injury is not disclosed, "'a patient's statement describing how an injury occurred is pertinent to a physician's diagnosis and treatment.'"*United States v. Bercier*, 506 F.3d 625, 630 (8th Cir. 2007)(quoting *United States v. Gabe*, 237 F.3d 954, 957-58 (8th Cir. 2001)). Mr. Houser did not specify who had dropped him. The Court thus finds that the second criterion is also satisfied.

The Government contends that the statement should not be admitted because Mr. Houser's psychiatric and medical issues rendered him unreliable. The Court rejects that portion of the testimony of the United States' expert, Dr. Zawada, that Mr. Houser was an inaccurate historian regarding falls at the VA Medical Center and other nursing homes. A review of the medical reports shows that numerous falls were reported by Mr. Houser that were corroborated by other evidence. Many times these occurrences were officially reported as falls in incident reports. In his medical records Mr. Houser is also repeatedly characterized as having a history of falling and of being a high fall risk. *See* Ex. 1, pp. 962, 1008, 1103, 1120, 1147, 1160 1164. Although the Court is cognizant of Mr. Houser's

4

psychiatric and medical issues, and has factored these issues in the weight to be given this evidence, the Court finds that the circumstances under which Mr. Houser communicated the statement that he had been dropped make it sufficiently reliable to be admissible.

The Daily Care Flow Sheets for Mr. Houser on August 29 and 30, 2006, were not completed so as to provide full information as to who was caring for Mr. Houser and what care was received by Mr. Houser. Although Rosemary Gill was a nurse aide assigned to care for Mr. Houser on the night of August 29, 2006, she testified that she did not know with whom she was working that night. Although the care charts were to be filled out in the regular course of providing medical care at the VA Medical Center, no care reports were listed for the night shift on August 29, 2006. Noone from the VA spoke with Rosemary Gill about what happened to Mr. Houser on August 29, 2006, until Gill was deposed by the Plaintiff in this action. Although any alleged deficiency in the investigation is not actionable, this calls into question the thoroughness of any VA investigation. Gill denied ever being involved in any incident in 2006 in which a patient was dropped, and no report was filed regarding such an incident. Gill admitted, however, that at some point in time she was removed from patient care at the VA Medical Center because of events involving allegations of rough handling of a patient.

Mr. Houser's attending physician, Dr. Burkhart, a general internist, was the medical director for the VA's Transitional Care Unit (T.C.U.) for 19 years. The T.C.U., which occupies two floors at the VA Medical Center, is the equivalent of a nursing home. However, the VA's T.C.U. provides more acute care than a typical nursing home. After Mr. Houser's bruising and fractures were discovered, Dr. Burkhart considered a fall as a possible cause of the bruising and fractures, but became less convinced that it was a fall. Dr. Burkhart was concerned that Mr. Houser had metastatic cancer and that this cancer caused the fractures. When Maria Houser questioned Dr. Burkhart as to the origin of her husband's fractures, Dr. Burkhart told her that Mr. Houser had cancer which metastasized to the bones. Dr. Burkhart testified, however, that after a bone scan and CT scan were performed, he gave up his belief that Mr. Houser had metastatic cancer. Mr. Houser's health continued to decline and he died on October 23, 2006. The autopsy report cites severe bilateral bronchaeolar pneumonia as the cause of death. The autopsy report for Mr. Houser does not indicate that Mr. Houser had cancer.

Dr. Burkhart and the Government's expert, Dr. Zawada, both opined at trial that the fractures

5

suffered by Mr. Houser were pathologic, insufficient fractures, which occurred because of very weak bones. Dr. Zawada testified that in his opinion the fractures and bruising could have occurred simply because of turning in bed.

An X-ray of Mr. Houser's shoulder that was taken on August 30, 2006, demonstrated a fracture of the left humeral neck with some degree of compaction. Plaintiff's expert, Dr. Lawrence Leon, a radiologist, compared this X-ray with a chest X-ray that had been taken of Mr. Houser on April 24, 2006. No fracture of the shoulder appeared on the April 24, 2006 X-ray. X-rays of Mr. Houser's left knee which were taken on August 31, 2006, demonstrated degenerative changes as well as a fracture of the lateral tibial plateau, partially compressed. The left knee X-ray also showed fractures through the proximal aspect of the medial and lateral tibia, as well as an oblique fracture of the proximal fibula. These X-rays also showed some degree of impaction. Exhibit 3.

Dr. Leon testified that fractures to the left shoulder and the left leg of Mr. Houser were consistent with a traumatic and impaction injury. Because Mr. Houser was elderly and his bones were weakened because of osteoporosis, only a minor amount of force was required to cause the fractures. Dr. Leon found no evidence of any underlying metastatic disease or tumors. Dr. Leon also testified that in order to suffer an impaction fracture, a person must have a force compressing the two bones together. This type of fracture is consistent with an injury a person would suffer from a fall. Although Mr. Houser had typically weakened bones for someone of his age who had been bedridden, Dr. Leon opined that the fractures did not occur just as a result of osteoporosis. Periosteal reaction was evident on the knee injury, but not on the shoulder injury. Although periosteal reaction evidences a healing process, Dr. Leon testified that the absence of the periosteal reaction on the shoulder injury does not necessarily mean that the shoulder fracture was more recent than the knee fracture. This Court accepts as valid the findings and opinions rendered by Dr. Leon.

Plaintiff's expert health care consultant for elder and long-term care, Lance Youles, testified as to an administrator's observations regarding Mr. Houser's injuries as well as to his experience in other cases involving similar injuries. Mr. Youles testified that in most settings where a mechanical lift is to be used to transfer a patient from bed, as was the case in Mr. Houser's situation, the standard of care is to use two people. Mr. Youles also testified that it is preferable to transfer a patient who is difficult to transfer by means of a lift. Mr. Youles explained that because nursing home residents

are typically frail, and the persons lifting them are limited to the parts of the resident's body that can be used for leverage, such as under the arms or under the legs, injuries can occur beneath the arms or legs when a lift is not used. A lift, on the other hand, allows a more uniform means of transfer. The Extended Care and Rehab Service Line Site Director for the VA Medial Center testified that two people should be required to operate a mechanical lift. Maria Houser testified, however, that at times she witnessed Mr. Houser being lifted from his bed by a lift operated by only one person, and at other times she witnessed Mr. Houser being lifted out of his bed by two male nurse's aides who did not use a lift.

Mr. Youles opined that given the circumstances of the case, including Mr. Houser's physical condition and complete reliance on staff, he had no doubt that Mr. Houser did not injure himself. Mr. Youles noted that Mr. Houser's care plan called for him being transferred by two people using a mechanical lift device and that the flow sheets and other records did not substantiate that the care plan was followed in that regard in the relevant time period. Mr. Youles opined that Mr. Houser's injuries occurred because of a deviation from the standard of care by staff. Although no investigation revealed the specific cause, Youles concluded that the injuries were the result of an improper transfer or a drop.[5]

Res Ipsa Loquitur and Liability

Three essential elements must be present to warrant application of the doctrine of res ipsa loquitur. They are: (1) the instrumentality which caused the injury must have been under the full management and control of the defendant or his servants; (2) the accident was such that, according to knowledge and experience, does not happen if those having management or control had not been negligent; and (3) the plaintiff's injury must have resulted from the accident. *Van Zee v. Sioux Valley Hosp.*, 315 N.W.2d 489 (S.D. 1982); *Fleege v. Cimpl*, 305 N.W.2d 409 (S.D. 1981); *Kramer v. Sioux Transit, Inc.*, 85 S.D. 232, 180 N.W.2d 468 (1970). In cases involving medical negligence, an additional element required for the doctrine of res ipsa loquitur to be applied is that the negligence must be established by the testimony of medical experts, unless the kind of negligence involved is

---

[5]Although Mr. Youles testified that the injuries could have been a result of abuse, he also testified that he did not arrive at that conclusion because he tended to give staff the benefit of the doubt on that issue.

within the realm of a layman's comprehension. *Van Zee v. Sioux Valley Hosp.*, 315 N.W.2d at 492. A plaintiff may introduce some evidence of negligence without losing the benefit of having the fact finder consider the doctrine of res ipsa loquitur. *Van Leirsburg v. Sioux Valley Hosp.*, 831 F.2d 169, 171 (8th Cir. 1987). Also, the doctrine of res ipsa loquitur is to be utilized sparingly and only when the facts and demands of justice make its application essential. *Shipley v. City of Spearfish*, 89 S.D. 559, 235 N.W.2d 911 (1975).

The Court concludes that the doctrine of res ipsa loquitur applies in this case. Mr. Houser, because of his physical and mental condition, was completely dependent on the VA staff to care for all his needs. Although there may be cases where fractures occur in nursing care without negligence by a care giver, the Court does not believe this is such a case. Mr. Houser's age combined with his situation of being bedridden and having taken valporic acid may account for weak bones. But in considering the statements of Mr. Houser that he had been dropped, the nature and location of the impaction fractures, as well as the evidence concerning the transfer practices and record keeping around the time the injuries were discovered, the Court does not believe the evidence supports attributing the cause of the injuries simply to weak bones. Rather, the Court determines that the preponderance of the evidence supports a finding that the negligence of a care giver or care givers caused Mr. Houser's injuries.[6]

Damages

Since liability of the defendant in this case has been established by the facts of the case, this Court must also determine appropriate damages. Wrongful death damages are awarded proportionate to the pecuniary injury resulting from such death to the persons respectively for whose benefit the action has been brought. S.D.C.L. § 21-5-7. Pecuniary injury encompasses more than strictly economic losses. Pecuniary loss is defined broadly to encompasses the loss to a beneficiary of such

---

[6] The facts in this case are significantly different from those in *Bunn v. Urban Shelter and Health Care Systems*, 672 A.2d 1056 (D.C. 1996), a case the United States cites in support of its position that res ipsa loquitur does not apply in this case. In *Bunn*, the female resident of a nursing home who suffered a broken hip had not walked for 12 years, had radiographic appearance of osteopenic bone, took a bone compromising medication, dilantin, and had a history of thyroid disease which can negatively affect the bones. In addition, this woman's bones appeared older than her chronological age and the woman did not attribute her broken hip to any conduct of the nursing staff. 672 A.2d at 1058-1059.

things as protection, guidance, advice, companionship and assistance that the beneficiaries might reasonably be expected to have derived from their decedent had his life not been terminated. It includes these losses "'but without consideration for the grief and mental anguish suffered by the beneficiaries because of the wrongful death.'" *Zoss v. Dakota Truck Underwriters*, 590 N.W.2d 911, 913-14 (S.D. 1999)(quoting *Sander v. Geib, Elston, Frost Prof'l Ass'n*, 506 N.W.2d 107, 119 (S.D. 1993)).

A determination of pecuniary injury arising from the death of an adult requires consideration of the factors set forth in South Dakota Civil Pattern Jury Instruction 31-01 and 31-02-1, which includes consideration of a decedent's life expectancy at the time of his death, the decedent's health, age, habits, talents and success, and the life expectancy, health and physical condition of the beneficiaries, and all reasonable expenses incurred for a funeral and for burial or other disposition of a decedent's body.

Dr. Brad Randall, a pathologist and Minnehaha County Coroner, reviewed the medical records and autopsy report[7] of Mr. Houser. Dr. Randall opined that the injuries suffered by Mr. Houser, and the resulting effects of stress and pain medication, substantially contributed to the acceleration of Mr. Houser's death. The Court accepts that opinion as valid.

With regard to Mr. Houser's life expectancy, this Court found persuasive the testimony of Dr. Zawada. Dr. Zawada is board certified in internal medicine, nephrology, geriatrics, critical care and clinical pharmacology. Dr. Zawada opined that Mr. Houser would have lived only months longer if he had not suffered the shoulder and knee fractures. Although Mr. Houser was not classified as having a limited life expectancy (likely less than 6 months) at the time his injuries were discovered, his medical problems were extensive. Also, the medical records state as early as August of 2005 that although Mr. Houser "isn't 'end of life.' he certainly is palliative care at this point." Ex. 1, p. 463. The Progress Note of his attending physician, Scott Huckins, M.D., for August 23, 2005, states that Maria Houser "is aware that [Mr. Houser] is slowly weakening and that he will die from this debilitation although I cannot predict the time course." Ex. 1, p. 466. Although Mr. Houser, until about a year before his death, weighed above his ideal weight of 154 pounds (Ex. 1, p. 701), his weight loss was accelerating

---

[7]The VA conducted the autopsy. The autopsy did not include bone biopsies.

in the months before his injuries, and he weighed substantially less than his ideal weight at the time his injuries were discovered. The Court finds, for purposes of determining damages, that Mr. Houser would have lived six months longer if he had not suffered the shoulder and knee fractures.

"In any case, it is difficult to measure the monetary value of the loss of companionship and society." *Flagtwet v. Smith*, 393 N.W.2d 452, 455 (S.D. 1986). In spite of this difficulty, this Court is required to adequately compensate for these losses. *Id.* at 456. The Court issued an Order allowing the parties to file information regarding damages awards in similar cases. Doc. 88. Although the Court considered this information, the Court did not find the information particularly helpful, as the damages in this and any other case must be evaluated on the merits of the case before the Court.

All of Mr. Houser's family members who appeared as witnesses at the Court Trial presented evidence of having been devoted, reliable and giving in their dealings with Mr. Houser, and also have presented evidence of compensable loss of companionship. The Court finds that Mr. Houser's sons, Frank Houser and Robert Lewis Houser, Jr., M.D., each suffered a loss of companionship in the amount of $5,000. While Mr. Houser's mental and psychological impairments precluded him from giving sound advice, apparently the history and relationship Maria and Anna had with their husband and father made him a comforting sounding board for them on many matters. Both Maria and Anna presented evidence of genuine affection between themselves and Mr. Houser, and both have suffered from the loss of his companionship. The Court is awarding Maria Houser $20,000 and is awarding Anna $15,000 for the loss of Mr. Houser's companionship. Maria Houser also suffered a pecuniary loss in the reduction of VA disability benefits from $2,813 to $1,400 per month, the reduction of Air Force pension from $1,500 to $0, and the reduction of Social Security benefits from $500 to $400 per month. The total of this economic loss to Maria Houser for Mr. Houser's accelerated death is $18,078.

Although the Department of Veterans Affair granted funeral and transportation costs in the amount of $1,510.00 (Ex. 25), the funeral bill for Mr. Houser was $6,251.60. (Ex. 26). Maria Houser, as the Special Administrator of the estate of Robert Houser, will be awarded damages for funeral expenses in the amount of $4,741.60.

The estate of Robert Houser has requested and is entitled to damages in the survival cause of action for the physical pain and mental and emotional suffering of Robert Houser from the time of his

injuries on or about August 30, 2006, until the time of his death on October 23, 2006. Mr. Houser suffered pain as a result of the fractures. While the VA medical staff attempted to lessen that pain, Mr. Houser still reported pain to his wife. The medical reports also support a finding that Mr. Houser's pain was not at all times under control. Ex. 1, pp. 13, 14, 59, 70, 81. Not until after the fractures occurred did Mr. Houser state that he was in such pain that he wanted to die. Evidence was also submitted which demonstrated that Mr. Houser experienced a loss of enjoyment of life activities such as his singing and eating. The Court is awarding the estate of Robert Houser $30,000 on the survival action.

## VERDICTS

1. The sum of $5,000 is awarded to Frank Houser for the wrongful death of Mr. Houser;

2. The sum of $5,000 is awarded to Robert Lewis Houser, Jr., M.D., for the wrongful death of Mr. Houser;

3. The sum of $15,000 is awarded to Anna Higgason for the wrongful death of Mr. Houser;

4. The sum of $38,078 is awarded to Maria Houser for the wrongful death of Mr. Houser;

5. The sum of $4,741.60 is awarded to the Estate of Mr. Houser for funeral expenses; and

6. The sum of $30,000 is awarded to the Estate of Mr. Houser on the survival action.

Dated this 30th day of December 2010.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _____
(SEAL) DEPUTY

11